**In re SLATER HEALTH CENTER, INC., Debtor.**

**Slater Health Center, Inc., Plaintiff,**

**v.**

**United States of America, United States of America Department of Health and Human Services, Secretary of the Department of Health and Human Services of the United States of America, Centers for Medicare and Medicaid Services ("CMS") and the Predecessor Agency thereto, the Health Care Financing Administration of the Department of Health and Human Services ("HCFA"), Blue Cross Blue Shield of Rhode Island, in its Capacity as Fiscal Intermediary of and for CMS and/or HCFA, Defendants.**

Bankruptcy No. 01–10273.
Adversary No. 02–1048.

United States Bankruptcy Court,
D. Rhode Island.

June 20, 2003.

Matthew J. McGowan, Esq., Linda Rekas Sloan, Esq., Salter McGowan Sylvia & Leonard, Inc., Providence, RI, for Debtor/Plaintiff.

Michael P. Iannotti, Assistant U.S. Attorney, Providence, RI, for Defendant United States of America Office of the United States Attorney.

Joseph M. DiOrio, Esq., R. Daniel Prentiss, Esq., Holland & Knight LLP, Providence, RI, for Defendant Blue Cross & Blue Shield of RI.

***ORDER (1) GRANTING DEBTOR'S MOTION TO RECONSIDER, (2) GRANTING DEBTOR'S MOTION TO ASSUME MEDICARE PROVIDER AGREEMENT, AND (3) DENYING THE DEFENDANTS' MOTION TO DISMISS***

ARTHUR N. VOTOLATO, Bankruptcy Judge.

Before the Court are: (1) The Debtor's Motion to Reconsider Order denying its request for temporary restraining order; (2) The Debtor's Motion to Assume Medicare Provider Agreement; and (3) The Motions of the United States of America and Blue Cross/Blue Shield to dismiss the above captioned adversary proceeding under Fed.R.Civ.P. 12(b). After hearing, the Motion to Reconsider is GRANTED; the

Debtor's motion to assume the Medicare Agreement is GRANTED; and for the reasons set forth *infra*, Count II of the Debtor's adversary Complaint requesting turnover of property of the estate is GRANTED. The Defendants' Motion to Dismiss is DENIED.

### BACKGROUND/TRAVEL

Slater Health Center ("Slater") is a 150–bed Medicare approved health care facility providing nursing home care and related services, and is a party to a Medicare Provider Agreement with the United States Department of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services (CMS). Blue Cross Blue Shield of Rhode Island ("Blue Cross") is the fiscal intermediary for CMS and is responsible for overseeing payments made by Medicare to Slater and for auditing annual cost reports filed by Slater with Blue Cross. Slater derives approximately 14% of its annual revenues from Medicare reimbursements.

On January 26, 2001, Slater filed a petition under Chapter 11. In October 2001, Blue Cross notified Slater that it was reopening its 1997 cost report for analysis, and on December 13, 2001, informed Slater that as a result of the analysis it was determined that Slater had been overpaid by Medicare to the tune of $56,218. On February 15, 2002, Blue Cross notified Slater that its 1998 cost report had also been reopened, revealing that Slater was overpaid $243,888 for that fiscal year, as well. Slater asserts that at various times Blue Cross threatened in writing that it intended to "offset" Slater's post-petition Medicare billings by these overpayments. In a (probably misguided) move to prevent such an offset, beginning in January 2002,

Slater stopped billing Medicare for post-petition services and built up receivables in excess of $720,000.

On June 19, 2002, when it could no longer afford to provide services without Medicare funding, Slater sought "emergency" relief in this Court by filing this adversary proceeding against the Medicare affiliates. That same day, Slater filed a motion for temporary restraining order seeking to prevent the Defendants from:

continuing to threaten to and/or actually reducing, withholding, setting off and/or attempting to recoup against any Medicare monies owing to Slater post-petition, and to otherwise prohibit any such withholding or reduction of such amounts due Slater in the future during the pendency of this Chapter 11 case; and (ii) declining or refusing to forthwith process post-petition Medicare claims of and turning over or otherwise paying to Slater all monies owed to it from such claims from and after Slater's Chapter 11 filing, without withholding or reduction of such amounts due Slater for any alleged pre-petition claims owed by Slater to such parties.

Slater's Motion for TRO, A.P. No. 02–1048, Document No. 2, page 2. The stated cause for the exigent circumstances was that if Medicare was allowed to reduce Slater's post-petition receivables by the overpayments, Slater would not have sufficient capital to operate. On August 9, 2002, after an expedited hearing, I denied Slater's request for a TRO, as Slater had not even filed a Medicare claim to collect the receivable, let alone pursue and exhaust its administrative remedies under 42 U.S.C. § 1395oo [1] before seeking judicial relief. After receiving this Order, Slater apparently filed its $720,000 claim, whereupon

---

**1.** The statute provides in relevant part:
(1) A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of

services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision. Providers shall have the right to obtain judicial review of any final decision

Medicare reduced its payment to Slater by $407,600. Of this amount, Slater responds that $37,031 was the result of an accounting error on Slater's part in the 1997 Medicare cost report, but that the $370,569 retained by Medicare, the alleged "overpayment", is property of the estate.

Slater disputes Medicare's use of the term *overpayment*, arguing that there was no overpayment in the true sense of the word. Rather, Slater argues, independent therapists provided services to the inpatients at Slater, that the patients received the care to which they were entitled, and that Slater billed Medicare for therapy services that were actually performed. To complete the picture, the $370,000 in question generated through services provided by outside professionals whom Slater failed to pay, probably was used in the operation of the business.

The United States argues that under 42 C.F.R. § 413.100(c)(2), Slater is allowed one year to liquidate its short term liabilities, that Slater defaulted as to this, and that therefore Medicare may disallow the reimbursement of the $370,000. Slater complains that allowing such a set off will be a windfall to Medicare and will cause a double hit to Slater—once when it is deprived of funds which directly correlate to what Slater owes the third party therapy providers, and again when it must pay the therapists as creditors in this case.

## A. Reconsideration

■ "[T]o succeed on a motion to reconsider, '. . . the moving party [must] show

of the Board, or of any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received. Providers shall also have the right to obtain judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the

newly discovered evidence or a manifest error of fact or law.' " *Champagne v. Equitable Credit Union (In re Champagne),* 146 B.R. 506, 508 (Bankr.D.R.I. 1992) (quoting *In re Wedgestone Financial,* 142 B.R. 7, 8 (Bankr.D.Mass.1992)); *In re Bank of New England Corp.,* 142 B.R. 584, 587–88 (D.Mass.1992). On reconsideration, Slater argues that it is not required to exhaust its administrative remedies because it does not challenge the validity or the merits of the Medicare overpayment claim, nor is it seeking judicial review of the claim. Rather, it is making arguments under bankruptcy law as to how the claim should be treated in this proceeding. In support, Slater cites *In re Healthback, L.L.C.,* 226 B.R. 464 (Bankr.W.D.Okla.1998), where the Court stated:

> . . . this argument [exhaustion of administrative remedies] is specious, as the foundation of this argument depends upon whether the party is seeking judicial review of the substantive Medicare law. As previously explained, the United States is erroneously attempting to characterize a bankruptcy proceeding as "judicial review". As this characterization is not accurate and as a bankruptcy proceeding is not making a substantive ruling on Medicare law, the doctrine of exhaustion of administrative remedies would not be applicable.

*Id.* at 470 n. 5. The Court further found that "the specific language of 42 U.S.C.

matters in controversy whenever the Board determines (on its own motion or at the request of a provider of services as described in the following sentence) that it is without authority to decide the question, by a civil action commenced within sixty days of the date on which notification of such determination is received. . . .

42 U.S.C. § 1395*oo*(f)(1).

§§ 405(h) does not state that jurisdiction under 28 U.S.C. §§ 1334 is subordinate to 42 U.S.C. §§ 405. [To the contrary,] ... under the plain language rule, 28 U.S.C. §§ 1334 grants bankruptcy jurisdiction over matters involving Medicare." *Id.* at 469.

■ Based upon *Healthback* and the cases cited therein, I find that the Debtor has stated cause for reconsideration of my prior order requiring it to exhaust administrative remedies.[2] Additionally, the Debtor has recently filed with the Court a decision of the Department of Health and Human Services Provider Reimbursement Review Board ("Board"), wherein the Board dismissed Slater's appeal regarding the cost reports in question because it lacked jurisdiction to determine the issue presented. The Board ruled that because Slater is not questioning the amounts or the merits of the alleged overpayments, it lacks jurisdiction, and went on to say that the "Provider is attempting to compel the agency to follow the appropriate regulations in its setoff or recoupment where a Chapter 11 bankruptcy is involved." Accordingly, reconsideration is GRANTED, my prior ruling as to exhaustion of administrative remedies is VACATED, and we will address the merits of the complaint.[3]

### B. Set Off or Recoupment?

■ While set off and recoupment are common law doctrines, set off is specifically incorporated into the Bankruptcy Code under Section 553 which states in part:

**2.** In hindsight, in requiring the Debtor to exhaust its administrative remedies, I was distracted by the fact that Slater did nothing for many months, allowing a Medicare receivable exceeding $700,000 to accumulate, and then filed an emergency motion with this Court claiming that nonpayment of the Medicare receivables was causing it extreme financial prejudice. That Slater had not even filed a claim for reimbursement with Medicare at the time it sought relief from an emergency

Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case...

11 U.S.C. § 553(a). The First Circuit Court of Appeals has stated:

Section 553 does not create new substantive law, but incorporates in bankruptcy the common law right of setoff, with a few additional restrictions. *U.S. ex rel. I.R.S. v. Norton,* 717 F.2d 767, 772 (3d Cir.1983). The right of setoff allows parties that owe mutual debts to each other to assert the amounts owed, subtract one from the other, and pay only the balance. *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.,* 896 F.2d 54, 57 (3d Cir.1990). However, allowing setoff undermines a basic premise of bankruptcy law, equality among creditors, by "permit[ting] a creditor to obtain full satisfaction of a claim by extinguishing an equal amount of the creditor's obligation to the debtor ... in effect, the creditor receives a 'preference'." *Id.* (quoting *In re Braniff Airways, Inc.,* 42 B.R. 443, 448 (Bankr. N.D.Tex.1984)). As a result, setoff in the context of a bankruptcy is not automatic. Under section 553, debts cannot

which it created, was very hard to square, and is this Court's excuse for making a mistake the first time around.

**3.** The parties have extensively briefed the issues at Bench and I find that the matters, at least at this stage, involve purely legal questions which the Court can determine without an evidentiary hearing. Any further hearings or argument would be cumulative.

be setoff unless they are mutual. Mutuality requires that the debts "be in the same right and between the same parties, standing in the same capacity." 4 *Collier on Bankruptcy* §§ 553.04 (15th ed.1992). *Darr v. Muratore,* 8 F.3d 854, 860 (1st Cir.1993). "Setoff is in the nature of a counterclaim, enabling a creditor to reduce the amount of a claim against it by an amount owed to the creditor on a mutual unrelated debt." *In re Holyoke Nursing Home Inc.,* 273 B.R. 305, 311 (Bankr. D.Mass.2002), *aff'd,* CA No. 02–30043– FHF (D. Mass. June 5, 2003).

 Recoupment, on the other hand, is "the satisfaction of an obligation by the crediting against it of a reciprocal obligation arising from the same transaction, typically the same contract." *In re Women's Technical Institute, Inc.,* 200 B.R. 77, 80 (Bankr.D.Mass.1996); *Holyoke Nursing Home Inc.,* 273 B.R. at 311. The "same transaction" requirement is construed narrowly and "a mere logical relationship is not enough." *Women's Technical Institute,* 200 B.R. at 81.

[T]he "fact that the same two parties are involved and that a similar subject matter gave rise to both claims, ... does not mean that the two arose from the 'same transactions.'" [*Lee v. Schweiker,* 739 F.2d 870, 875 (3rd Cir.1984)]. Rather, both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations. *In re University Medical Center,* 973 F.2d at 1081.

*Id.*

 Recoupment essentially allows one party to a transaction to withhold funds due the other party, provided that both debts arise from the same transaction. Conversely, setoff allows adjustment of mutual debts arising from separate transactions. *See Conoco Inc. v. Styler (In re Peterson Distributing, Inc.),* 82 F.3d 956, 959 (10th Cir.1996). Another important difference is that Section 553 allows set off subject to the automatic stay under Section 362, while the majority of cases hold that recoupment is not subject to the automatic stay. *See Holyoke Nursing Home Inc.,* 273 B.R. at 311.

 Slater argues that Medicare effected an impermissible set off that violated the automatic stay because the debts were not mutual, i.e., the cost report determinations at issue were for pre-petition years while the funds retained by Medicare were from post-petition receivables. As further evidence of lack of mutuality, Slater argues that the payment structure between the Debtor and Medicare changed, in that prior to bankruptcy Medicare worked on a *retrospective* payment system, while post bankruptcy the system changed to *prospective.*[4]

Medicare contends that its actions constitute a permissible and valid recoupment as defined under *United States v. Consumer Health Services of America, Inc.,* 108 F.3d 390 (D.C.Cir.1997), and *Sims v. United States Department of Health and Human Servs. (In re TLC Hosps., Inc.),* 224 F.3d 1008 (9th Cir.2000). These cases characterize the reimbursement system between Medicare and the provider as a single transaction, because the particularities of the Medicare statutes create a "specialized and continuous system of estimated payments and subsequent adjust-

---

4. Slater uses these terms (*retrospective* and *prospective*), and while they are mentioned in the Affidavit of Theodore diStefano, Slater's President, the payment systems are not defined in any further detail by the Debtor.

ments." *Id.* at 1012. The Court explained the system as follows:

> The Medicare statute specifies an accelerated payment system to ensure that providers are paid promptly. Under this system, a Medicare provider like TLC receives periodic payments for its services on an *estimated* basis prior to an audit which determines the precise amount of reimbursement due to the provider. 42 U.S.C. §§ 1395g; *see generally Consumer Health Servs.,* 108 F.3d at 392. Consequently, underpayments and overpayments are an expected and inevitable result of this payment system.
>
> Regulations promulgated by the Secretary require the provider to submit a "cost report" on an annual basis. 42 C.F.R. §§ 413.20(b). A fiscal intermediary under contract with HHS calculates and dispenses the estimated periodic payments which are to be made "not less often than monthly." 42 U.S.C. §§ 1395g(a). At the end of each "reporting year," the intermediary, relying on the cost report, conducts an audit of the provider. 42 C.F.R. §§ 405.1803(a). The audit entails a reconciliation of the amount due to the provider under the Medicare statute with the amount of estimated interim payments dispensed for the same period. Thus, the audit reveals the precise amount of any overpayments or underpayments. *See id.;* 42 U.S.C. §§ 1395g(a).
>
> Upon the conclusion of the audit, a "retroactive adjustment" is made. 42 C.F.R. §§ 413.64(f); *see also* 42 U.S.C. §§ 1395g. If the provider has been underpaid, the intermediary dispenses the difference to the provider. If there are any overpayments, the intermediary must set forth the results and explain its findings in a Notice of Program Reimbursement. *See* 42 C.F.R. §§ 405.1803. To recover the overpayments, the inter-

mediary may either adjust subsequent reimbursement payments or arrange for repayment by the provider. 42 U.S.C. §§ 1395g(a); 42 C.F.R. §§§§ 405.1803(c), 413.64(f); *see also* 42 C.F.R. §§ 405.371(a). Thus, overpayments from one fiscal year may be recovered by adjusting the interim payments for a subsequent fiscal year.

*TLC,* 224 F.3d at 1011–12. These cases represent the majority view on the subject.

The minority view is stated in *University Medical Center v. Sullivan (In re University Medical Center),* 973 F.2d 1065 (3rd Cir.1992), where the Third Circuit Court of Appeals found that each transaction flowing from the Medicare/provider relationship constituted a separate transaction. *Id.* at 1081–82. The Court stated that Medicare payments in one cost year do not relate to services performed in subsequent cost years for purposes of equitable recoupment, *id.,* and focused on the annual audit conducted by the Department of Health and Human Services as the defining standard for determining that the transactions were separate. *Id.*

The majority view, as represented by *TLC Hospitals, Inc.,* is the better reasoned approach. "On balance, characterizing the parties' conflicting claims by focusing upon the individual services rendered to patients or upon the audit time frames, sacrifices a sound view of the forest for a close examination of the trees." *Holyoke Nursing Home,* 273 B.R. at 312.

The transactional relationship between the government and the provider is not an agreement by the government to provide reimbursement for specific services rendered to "Mary Jones" or "John Smith," but rather to reimburse providers who render specified services to any qualified patient. It is also true that the program is designed to pay estimated

amounts to providers on a monthly basis, subject to audit. However, there is nothing integral to the services rendered or to the reimbursement for those services which mandates that the audit periods be set on an annual basis, instead of bi-annually or semi-annually. The government's agreement is not to quantify reimbursements based on a specific cost year, but rather to advance an estimated reimbursement on a monthly basis, subject to audit, which the government *chooses* be done by examining one year at a time.

*Id.* The Medicare statute defines the relationship, while the audit is merely the mechanism for determining whether or how much to adjust subsequent periodic payments. *TLC,* 224 F.3d at 1013. Accordingly, I hold that Slater and Medicare are parties to a single, continuous and integrated transaction from which there arose a $407,600 pre-petition "overpayment" to Slater which is subject to recoupment from Slater's post-petition Medicare receivables.

■ Medicare's ability to recoup, however, is not automatic and unfettered. Recoupment is an equitable doctrine where equity goes both ways. *See Healthback,* 226 B.R. at 476; Daniel C. Burton & Thomas W. Waldrep, Jr., *Medicare and Medicaid Receivables: Recoupment or Setoff?,* 21 Am. Bankr.Inst. L.J. 18, 18–19 (June 2002); *see also In re Masterwear Corp.,* 229 B.R. 301 (Bankr.S.D.N.Y.1999)

("Recoupment, like setoff, operates to prefer one creditor over every other, and in light of bankruptcy law's strong policy favoring debtor protection and equal treatment of creditors, should be regarded as narrowly construed, equitable exception to automatic stay"). In determining whether to allow recoupment, the relative harm to both parties should be carefully weighed. *See Healthback,* 226 B.R. at 476; Burton & Waldrep, 21 Am. Bankr.Inst. L.J. at 18–19.

■ Most of the "overpayment" in this case ($370,569) was generated by outside professionals who provided therapy services to Slater's patients. The patients received the treatment and Medicare paid Slater for the services provided to the patients. The Debtor argues, and Medicare has not refuted, that if Medicare is allowed to retain these funds, Medicare will not in turn pay the therapists,[5] and there will be a windfall to Medicare. Weighing the relative harm here is easy. The therapists, the Debtor, and the Debtor's other creditors will all be prejudiced by the disappearance of over $370,000 from this already distressed reorganization, either in the form of a reduced payment to unsecured creditors, or in the worst scenario, a failed reorganization. Medicare, on the other hand, if allowed to recoup, would be the happy and undeserving recipient of over $370,000 earned by the therapy providers.

---

**5.** The Debtor wishes to conduct discovery on this issue. I do not believe there is a material factual issue in dispute and feel that discovery would not be an efficient use of resources. The Medicare statute in question, 42 C.F.R. § 413.100(c)(2), which allows Medicare to disallow cost reimbursements to providers for failure to timely liquidate short term liabilities, is silent as to what happens when such funds end up in Medicare's hands. The Government argues (and I agree) that the Medicare program is governed by a detailed system of laws and regulations that dictate how funds flow in and out of the system. As such, if Medicare were authorized by its regulations to pay the therapy providers directly upon Slater's default, this would have been pointed out in the papers. But there is general silence on this issue and I find no authority in the applicable regulations for Medicare to pay the therapists directly. Reconsideration of this ruling is, of course, appropriate if we have missed something here.

Medicare's only point here is that, based on its reconciliation process, it is entitled to these funds because of the Debtor's default, period. In an equity context, this falls short of the case where Medicare seeks to recoup funds on account of a true overpayment, i.e., where Medicare has paid more than the value of the services provided.

Accordingly, Count II of the Debtor's Amended Complaint is GRANTED, Medicare's attempt to recoup $370,569 is rejected, and Medicare is ORDERED to turn over said funds to the Debtor forthwith. The Debtor shall hold these funds in a separate account until further order. A hearing will be scheduled upon notice to interested parties, including the therapy creditors, concerning the disposition or use of said funds. The recoupment of $37,031, the result of the Debtor's (admitted) accounting errors in a 1997 Medicare Cost Report is ALLOWED, and Medicare shall retain those funds.

## C. Assumption of the Medicare Agreement

The Debtor has also filed a motion under 11 U.S.C. § 365 to assume the Medicare Provider Agreement with the Department of Health and Human Services. Medicare objects, arguing that before assumption is allowed, the Debtor must cure any defaults under the Agreement, including reimbursement of the "overpayment" discussed above.

■ The Bankruptcy Code does not define "executory contract," but the legislative history explains that the term "generally includes contracts on which performance remains due to some extent on both sides." H.R.Rep. No. 595, 95th Cong., 1st Sess. 347(1977); S.Rep. No. 989, 95th Cong.2d Sess. 58 (1978) *reprinted in* 1978 U.S.C.C.A.N., 5787, 5844. The case law consistently holds that a Medicare provid-

er agreement easily fits within this definition. *See University Medical Center,* 973 F.2d n. 13 at 1075, and Section 365 which allows assumption of an executory contract even if there has been a default under the agreement, provided certain conditions are met. *See* 11 U.S.C. § 365(b), which provides:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, *for any actual pecuniary loss to such party resulting from such default;* and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1) (emphasis added).

■ The Debtor concedes, as it must, that in order to assume the Medicare provider agreement it must cure the undisputed $37,031 overpayment, and that has been done. The Debtor contends however, that the balance of Medicare "overpayment" of $370,569 need not be cured because Section 365(b)(1)(B) only applies where there has been "actual pecuniary loss," and that this sum is not for an actual pecuniary loss to Medicare. Why not? Because therapy services were actually provided to Slater's patients, that Medicare paid for services actually received, and that no patient benefits were compromised. Clearly it is the therapy providers (and not Medicare) who have suffered an actual pecuniary loss, be-

cause they furnished $370,569 worth of services and have not been paid.

In support of its position, the Debtor cites to *Texas American Oil Corp. v. United States Dept. of Energy*, 44 F.3d 1557 (Fed.Cir.1995). *Texas American* involved the classification of the United States Department of Energy's claim in the chapter 11 trustee's plan of liquidation one tier below general unsecured creditors, in accordance with 11 U.S.C. § 726(a)(4). *Id.* at 1565–66. The trustee argued that because the money being collected by the Department of Energy under the Economic Stability Act was never paid to the persons who suffered the actual pecuniary loss, but merely kept in a general fund, the claim was akin to a penalty and should be treated and classified as such under the Bankruptcy Code. *Id.* The Department of Energy asserted that its claim was for restitution under the Act for alleged overcharges by a subsidiary of the Debtor and should be treated on par with other general unsecured creditors. *Id.*

The Court examined Section 726(a)(4) [6] which subordinates penalties and fines to a level under general unsecured creditors, provided the fine or penalty is not compensation for actual pecuniary loss suffered by the holder of the claim. *Id.* at 1568–71. The Court looked beyond the "restitution" label imposed by the Economic Stability Act, and found that the Department of Energy's claim was in fact a penalty and not for an actual pecuniary loss, as the

overcharges were being retained by the government and not being passed on to the real creditors. *Texas American*, 44 F.3d at 1568–71. In allowing subordination, the Court stated:

> When those injured are not restored to their previous position the disgorgement partakes not of restitution, but of recovery by government of the illegal gains for remedial and enforcement purposes.... "[T]he label placed upon an imposition in a revenue measure is [not] decisive in determining its character.... the character of a penalty cannot be changed by calling it a tax."

*Id.* at 1570–71 (*quoting In re Unified Control Sys., Inc.*, 586 F.2d 1036, 1037–38 (5th Cir.1978)) (citations omitted).

The Debtor argues that although *Texas American* was decided in the context of Section 726(a)(4), the analysis should apply with equal force for purposes of Section 365(b)(1)(B), and I agree. To begin with, both statutes use the same exact verbiage, i.e., "actual pecuniary loss." Additionally, I feel that *Texas American* correctly treats the phrase "actual pecuniary loss" whether it appears in Section 726 or Section 365.[7] *See Sullivan v. Stroop*, 496 U.S. 478, 484, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990) (stating that the normal rule of statutory construction requires identical words used in different parts of the same act to be given the same meaning).

---

**6.** The statute provides: "fourth, in payment of any allowed claim, whether secured or unsecured, for any fine, penalty, or forfeiture... to the extent that such fine, penalty, forfeiture, or damages are not compensation *for actual pecuniary loss* suffered by the holder of such claim." 11 U.S.C. § 726(a)(4) (emphasis added).

**7.** *Texas American* also clearly articulates the notion: that which the government is able to accomplish outside of bankruptcy through its

regulations is not necessarily what it may do within a bankruptcy proceeding. *See also Federal Communications Commission v. NextWave Personal Communications, Inc.*, 537 U.S. 293, 123 S.Ct. 832, 154 L.Ed.2d 863 (2003)(FCC is bound by Bankruptcy Code and cannot cancel a debtor's license due to a valid regulatory motive. "[W]here Congress has intended to provide regulatory exceptions to provisions of the Bankruptcy Code, it has done so clearly and expressly...").

In the instant case, Medicare tries to characterize its claim as an "overpayment" and, without logical support, argues that it is for an actual pecuniary loss "because money is involved." Looking beyond the labels used in its own statutes, I find that the $370,569 Medicare claim is not for an actual pecuniary loss to the government. The statute, if read Medicare's way, operates to serve the punitive function of punishing Slater for its default by allowing the government to retain the fruit of the therapy providers' services. Just because, on its own playing field, and under its own regulations, Medicare can reverse a reimbursement to a provider on account of a provider's failure to timely liquidate its short term liabilities, and to retain those funds, does not convert Medicare into an "out-of-pocket creditor" who sustained an actual pecuniary loss in a Section 365 bankruptcy context. *Texas American*, 44 F.3d at 1571.

The only actual pecuniary loss suffered by Medicare is the $37,031 resulting from the Debtor's accounting errors in a prior cost year, which sum has already been recouped, and which is not being disputed. No other cure is necessary. For the foregoing reasons, the Debtor's Motion to assume the Medicare provider agreement is GRANTED.

### D. The remaining Counts of Debtor's Amended Complaint

In its Amended Complaint the Debtor seeks relief under eight counts, and is premised on the fact that the Defendants—the United States, Blue Cross Blue Shield of Rhode Island, *et al.*, committed an egregious and an unlawful act effectuating what I have ultimately found to be a valid recoupment. The various counts request: (I) Injunctive Relief; (II) Turnover of Property of the Estate; (III) Recovery for Improper Post–Petition Transfers; (IV) Monetary Recovery for Improper and Unauthorized Setoff, or Other Improper Conduct; (V) Monetary Recovery From Defendants for Improper Payment or Satisfaction of Claim, Loss or Amount not Authorized to be Paid Under Bankruptcy Code § 365(b)(1)(B); (VII) Contempt for violation of Automatic Stay and Compensatory and Punitive Damages; and (VIII) Equitable Subordination under Section 510. The real relief sought by the Debtor boils down to the return of the $407,600 recouped by the Defendants, plus interest; punitive and actual damages plus attorneys' fees for the Defendants' alleged stay violation; and equitable subordination of any claims of the Defendants.

This opinion has dealt with and resolved the Debtor's principal grievance, i.e., the disposition of the recouped funds, and has ordered the return of those funds under Count II of the Amended Complaint. Because I find the Defendants' conduct not to be egregious, the Debtor's request for additional damages, attorney's fees and interest is denied.[8] I will deal with two remaining legal issues raised by the Amended Complaint—violation of the automatic stay and equitable subordination under Section 510 of the Code.

 The majority of cases on the subject have held that the provisions of the automatic stay do not apply to recoupment. *See Holyoke Nursing Home Inc.,* 273 B.R. at 311. Based on this record, I find that the Defendants did not violate the automatic stay and that any claim seeking damages and attorneys' fees under such a theory must be dismissed as failing

---

**8.** Had the $370,000 in question been on account of an actual pecuniary loss to Medicare, similar to the loss produced by the Debtor's admitted accounting error, the result here would have been much different for the Debtor.

to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6). *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

■ Similarly, the Debtor's request for equitable subordination under Section 510 also fails. Section 510 provides:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c). In considering this statute, the First Circuit Court of Appeals has stated:

Section 510(c) of the Bankruptcy Code specifically authorizes a bankruptcy court to apply "principles of equitable subordination." ... The judicially-developed case law of equitable subordination is of long standing.... The doctrine permits a bankruptcy court to rearrange the priorities of creditors' interests, and to place all or part of the wrongdoer's claim in an inferior status. The generally-recognized test for equitable subordination, adopted by this court, is set forth in *In re Mobile Steel Co.,* 563 F.2d 692, 703 (5th Cir.1977):

(i) The claimant must have engaged in some type of inequitable conduct.

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*Id.* at 699–700 (citations omitted). *See also In re Giorgio,* 862 F.2d 933, 938–39 (1st Cir.1988) (applying *Mobile Steel* test); 3 Collier at ¶¶ 510.05[2].

*In re 604 Columbus Ave. Realty Trust,* 968 F.2d 1332, 1353 (1st Cir.1992). The Court went on to describe the types of inequitable conduct that typically qualify for equitable subordination.

Although the remedy of equitable subordination has been applied relatively infrequently, it is usually directed towards misconduct arising in three situations: when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; when a third party dominates or controls the debtor to the disadvantage of others; or when a third party defrauds the other creditors....

*Id.* at 1359–60. Given my findings, *supra,* on recoupment, there are no facts presented in this case that would warrant equitable subordination of Medicare's claims *under Section 510.*

This ruling, however, does not foreclose any right the Debtor may have to statutorily subordinate Medicare's $370,569 claim pursuant to Section 726(a)(4). *See* Footnote 6 *supra;* see also *Texas American,* 44 F.3d at 1571. "In effecting the principles of creditors' and debtors' rights and obligations, one of the firmest of principles is that creditors who suffered a pecuniary loss to the bankrupt have priority of claim over those who suffered no pecuniary loss." *Id.* at 1570.

Accordingly, Count I and Counts III through VIII of the Debtor's Amended Complaint are DENIED. Enter Judgment in favor of the Debtor under Count II; and, the Defendants' Motion to Dismiss is DENIED as moot.

Enter judgment consistent with this opinion.