**In re SLATER HEALTH CENTER, INC.**

**Slater Health Center, Inc.,**
**Plaintiff/Appellee,**

**v.**

**United States of America, et al.,**
**Defendants/Appellants.**

**No. 03–275T.**

United States District Court,
D. Rhode Island.

Feb. 17, 2004.

Michael P. Iannotti, U.S. Attorney Office, Joseph Michael DiOrio, Holland & Knight LLP, Providence, RI, for appellants.

Matthew J. McGowan, Salter, McGowan, Sylvia & Leonard, Inc., Providence, RI, for appellee.

### *MEMORANDUM AND ORDER*

TORRES, Chief Judge.

The United States of America ("the government") and Blue Cross & Blue Shield of Rhode Island ("Blue Cross") have appealed four orders of the Bankruptcy Court regarding the disposition of $370,569 in Medicare payments withheld from Slater Health Center, Inc. ("Slater") in order to adjust for alleged overpayments made to Slater before it filed a Chapter 11 bankruptcy petition.

The principal question presented is whether withholding the overpayments from amounts otherwise owed to Slater for post-petition services violates the automatic stay provisions of § 362(a)(7) of the Bankruptcy Code. 11 U.S.C. § 362(a)(7).

For the reasons hereinafter stated, this Court answers that question in the negative; and, therefore, vacates a portion of the first order and dismisses, as moot, the appeals from the remaining orders.

### Background

Most of the relevant background facts may be gleaned from the Bankruptcy Court's very thorough and well-written decision of June 20, 2003. *In re Slater Health Ctr., Inc.,* 294 B.R. 423 (Bankr. D.R.I.2003). Those facts may be summarized as follows.

Slater operates a nursing home and is a party to a Medicare Provider Agreement with the United States Department of Health and Human Services ("HHS") through the Center for Medicare and Medicaid Services ("Medicare"). Under the Medicare Provider Agreement, Slater receives payment for nursing home care and services provided to Slater's patients. Some of those services are rendered by third-party providers with whom Slater contracts. Medicare reimburses Slater for the expenses it incurs in obtaining those third-party services.

During each fiscal year, Medicare makes advance payments to Slater based on estimates regarding the amount that will be owed to Slater for that year. 42 U.S.C. § 1395g. At the end of each fiscal year, Slater is required to submit a "cost report" documenting the care and services provided. 42 C.F.R. § 413.20(b). That report is audited by Blue Cross, the fiscal intermediary for Medicare. *See* 42 C.F.R. § 405.1803(a); 42 C.F.R. § 413.64(f)(1). The result of the audit determines the precise amount due Slater for that year. 42 C.F.R. § 413.64(f)(1). If the amount due differs from the amount already paid, a "retroactive adjustment" is made. *In re TLC Hosp., Inc.,* 224 F.3d 1008, 1012 (9th Cir.2000); *see also* 42 U.S.C. § 1395g(a); 42 C.F.R. §§ 405.1803(c), 413.64(f). Thus,

if the audit shows that Slater was not paid in full, the deficiency is paid to Slater. Conversely, if the audit shows that Slater was paid more than the amount to which it was entitled, Medicare may either withhold the amount of overpayment from subsequent reimbursements or make other arrangements to obtain repayment from Slater. 42 U.S.C. § 1395(g)(a); 42 C.F.R. §§ 405.1803(c), 413.64(f); *see also* 42 C.F.R. § 405.371(a).

On January 26, 2001, Slater filed a Chapter 11 bankruptcy petition but continued to operate as a debtor in possession. Blue Cross later informed Slater that audits for the years 1997 and 1998 revealed overpayments and that Blue Cross intended to "offset" those overpayments against Slater's future billings.

In what the Bankruptcy Court referred to as a "probably misguided" attempt to prevent the "offsets," Slater chose to stop billing Medicare for post-petition services. However, when Slater's receivables reached a level that threatened its ability to continue operating, Slater brought an adversary proceeding seeking to enjoin the defendants from withholding the alleged overpayments from payments for post-petition services.

While the adversary proceeding was pending, Slater apparently billed Medicare in the amount of $720,000 for post-petition services. Medicare paid only the difference between that amount and $407,600, the amount of the alleged overpayments previously made. Slater concedes that it made an accounting error of $37,031 but Slater contends that the remaining $370,569 must be paid to the estate. Slater argues that the $370,569 was not an "overpayment in the true sense of the word"; and, therefore, offsetting it against amounts due for post-petition services would violate the automatic stay provisions of 11 U.S.C. § 362(a)(7).

While the adversary proceeding was pending, a motion also was filed, pursuant to 11 U.S.C. § 365, to allow Slater, as the debtor in possession, to assume the Medicare Provider Agreement. Medicare objected on the ground that § 365 requires that it be reimbursed for the overpayments made to Slater before the Medicare Provider Agreement can be assumed.

The Bankruptcy Court's June 20, 2003, decision ordered Medicare to pay the $370,569 to the debtor and directed that the money be held in escrow pending further order regarding its ultimate disposition. The Bankruptcy Court also granted the debtor's motion to assume the Medicare Provider Agreement. *Slater*, 294 B.R. at 434. The Bankruptcy Court found *inter alia*, that, because services valued at nearly $370,569 had been rendered to Slater's patients by third-party providers; and, because the third-party providers had not been paid, it would be inequitable to allow Medicare to retain the $370,569. The Bankruptcy Court concluded that the money should be turned over to the estate for payment to the third-party providers. *Id.* at 431–32. The defendants appealed the June 20, 2003 order to this Court. (Appeal no. 1).

While Appeal no. 1 was pending, the Bankruptcy Court conducted a hearing to determine how the $370,569, which had not yet been turned over to the debtor,[1] should be disbursed. On September 23, 2003, the Bankruptcy Court entered an order directing that the money be "held by the Debtor until further order of the Court and shall not be held or earmarked for unpaid therapy creditors." Bankr.Ct. Sept. 23, 2003 Order. The transcript of the hearing makes it clear that the Bankruptcy Court had changed its mind and intended that the $370,569 would be distributed as part of the debtor's estate rather than being paid to the third-party providers. The defendants appealed that order, too. (Appeal no. 2).

On October 30, 2003, the Bankruptcy Court entered an order granting Slater's motion for a determination that Medicare suffered no "actual pecuniary loss" by being required to pay the $370,569; and that, therefore, under the Second Amended Plan of Reorganization (the "Plan"), they were not entitled to any distribution. Once again, the defendants appealed. (Appeal no. 3).

On November 12, 2003, the Bankruptcy Court entered an order confirming the Plan. Among other things, the Plan called for assignment of the Medicare Provider Agreement to Haven Health Center ("Haven") free and clear of Medicare's "Payback Claim" for the $370,569 "overpayment." Plan, art. V. The order also enjoined Medicare and/or Blue Cross from asserting any such claim against Slater and/or Haven. The appeal from that order is Appeal no. 4.

### Standard of Review

A district court may not set aside a bankruptcy court's findings of fact unless they are "clearly erroneous." Fed. R. Bank. P. 8013. Factual findings are clearly erroneous only if the reviewing court " 'has a definite and firm conviction that a mistake has been committed.' " *In re Givens*, C.A. No. 98–18T, 2001 WL 34136695, at *4 (D.R.I. March 16, 2001)(quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). On the other hand, a bankruptcy court's conclusions are subject to *de novo* review. *Palmacci v. Umpierrez*, 121 F.3d 781, 785 (1st Cir.1997).

---

**1.** On September 11, 2003, this Court issued an order staying that portion of the Bankruptcy Court's order requiring payment of the $370,569 to the debtor.

## Analysis

### I.  Jurisdiction

■ As a preliminary matter, the government argues that the Bankruptcy Court lacked jurisdiction to order payment of the withheld funds because Slater failed to exhaust its administrative remedies. More specifically, the government contends that, in order to contest a Medicare payment decision, one must follow the administrative appeals process described in 42 U.S.C. § 1395oo and 42 C.F.R. § 405, Subpart R.

The short answer to that argument is, as the Bankruptcy Court observed, that Slater is not contesting Medicare's claim that an "overpayment" was made; but, rather, Slater contends that § 362(a)(7) does not permit the "overpayment" to be offset against charges for post-petition services. That raises an issue governed by bankruptcy law and the bankruptcy jurisdiction conferred by 28 U.S.C. § 1334 is not divested simply because the claim arises under the Medicare statute. *See Slater,* 294 B.R. at 427–28. Since the Bankruptcy Code supplies an independent basis for jurisdiction, the exhaustion of administrative remedies is not required. *See In re University Med. Ctr.,* 973 F.2d 1065, 1074 (3rd Cir.1992).

In any event, Slater did pursue the matter administratively and its appeal to the Department of Health and Human Services Provider Reimbursement Review Board was dismissed on the ground that the Board lacked jurisdiction because Slater did not question the overpayments; but, rather, disputed Medicare's right, under the Bankruptcy Code, to recoup the overpayments. *Slater,* 294 B.R. at 428.

### II.  The Right to Withhold Overpayments

The threshold question underlying all four appeals is whether Medicare is entitled to withhold the $370,569 in "overpayments" from the amount otherwise payable to Slater for post-petition services. In order to answer that question, one must examine the Medicare Provider Agreement and the relevant provisions of the Medicare Statute, 42 U.S.C. §§ 1395 *et seq.,* as well as the automatic stay provisions of § 362(a) of the Bankruptcy Code.

### A.  The Provider Agreement and Medicare Law

There is no question that, at least outside the bankruptcy context, Medicare is entitled to withhold overpayments made to Slater in one fiscal year from amounts owed to Slater in subsequent fiscal years.

Nor, as Slater concedes, is there any question that the $370,569 represents overpayments. As already noted, the sums periodically advanced to Slater were estimated payments subject to retroactive readjustment based on audits of Slater's annual cost reports. Thus, the final amount actually due Slater was not determined until after the audit process was completed. Slater received the $370,569 as reimbursement for amounts that it paid for services furnished by third-party providers but Slater did not use the money for that purpose and it failed to pay the third-party providers.

Finally, there is no question that the Medicare statute expressly authorizes "overpayments from one fiscal year to be recovered by adjusting the interim payments for a subsequent fiscal year." *TLC Hosp.,* 224 F.3d at 1012. Therefore, the only question is whether bankruptcy law prevents the overpayments from being withheld.

### III.  Bankruptcy Law

### A.  Applicability of the Automatic Stay

Slater argues, and the Bankruptcy Court held, that the automatic stay provi-

sion of § 362 bars Medicare from withholding the $370,569 in overpayments. More specifically, Slater relies on § 362(a)(7), which automatically stays "the *setoff* of any debt owing to the debtor that arose before the commencement of the [bankruptcy] case...." 11 U.S.C. § 362(a)(7) (emphasis added).

Section 362(a)(7) is designed to prevent a creditor from obtaining preferential treatment by "reduc[ing] the amount of a [debtor's] claim against it by an amount owed to the creditor on a mutual unrelated debt." *In re Holyoke Nursing Home Inc.,* 273 B.R. 305, 311 (Bankr. D.Mass.2002), *aff'd,* C.A. No. 02–30043–FHF (D. Mass. June 5, 2003). However, the prohibition against "setoff" applies only to amounts owed to the creditor with respect to a debt that is *unrelated* to the obligation owed by the creditor to the debtor. *See id.* It is well established that when reciprocal obligations arise from the same transaction, a creditor may recoup the amount owed to it from the amount that it owes to the debtor. *In re Malinowski,* 156 F.3d 131, 133 (2d Cir.1998).

The rationale for permitting recoupment is that when mutual debts grow out of a " '*single integrated transaction* y(3)27 it would be *inequitable* for the debtor to enjoy the benefits of that transaction without also meeting its obligations.' " *Id.* (quoting *University Med. Ctr.,* 973 F.2d at 1081)(alteration in original). Thus, unlike "setoff," "recoupment" is not subject to the automatic stay provisions of § 362. *Id.; University Med. Ctr.,* 973 F.2d at 1079–80.

The Bankruptcy Court observed that most courts addressing the question have held that Medicare payments owed for post-petition services and overpayments previously made are part of a "single, continuous and integrated transaction"; and, therefore, withholding the overpayments is a recoupment that does not violate § 362. *Slater,* 294 B.R. at 431; *see also TLC Hosp.,* 224 F.3d at 1012; *Holyoke Nursing Home,* 273 B.R. at 312. However, although the Bankruptcy Court correctly adopted the majority view as "the better reasoned approach," *Slater,* 294 B.R. at 430, it held that equitable principles prevented Medicare from recouping the $370,569 in overpayments made to Slater. *Id.* at 432.

In basing its decision on recoupment analysis, the Bankruptcy Court overlooked the fact that the issue of recoupment arises only where there are two reciprocal obligations and it is necessary to determine whether one can be offset against the other. There is no need to consider recoupment when there is a single obligation to the debtor and the only issue is whether the amount in question must be deducted in order to calculate the sum owed to the debtor. In such cases, since the debtor has no claim to the amount in question, there is nothing that can be offset. Furthermore, the amount in question cannot be part of the debtor's estate. Therefore, the automatic stay is inapplicable. *See Malinowski,* 156 F.3d at 133 (cases cited).

Whether the $370,569 must be deducted in determining the amount of Slater's claim is a matter that is governed by Medicare law. The Bankruptcy Code does not "modify an explicit statutory scheme defining liability for particular services" provided by a nursing home to Medicare patients or "override an explicit statutory limitation on what the government owes for a particular service." *United States v. Consumer Health Serv.,* 108 F.3d 390, 394–95 (C.A.D.C.1997).

Here, it is clear that Slater has a claim only for the difference between the charges for post-petition services and the $370,569 in overpayments. That money was advanced based on estimates of the

amounts that would be owed to Slater at the end of each year but the amounts *actually* due Slater were not determined until after audits of Slater's cost reports were performed. Those audits revealed that the amounts advanced were determined to be $370,569 more than the amounts actually due. Because the Medicare statute expressly provides for adjusting the amount owed to a provider by withholding past overpayments, Slater's net claim is for $349,431 (i.e., $720,000 less the $378,569 in overpayments previously advanced) not $720,000. Since the $370,569 already has been taken into account in calculating Slater's claim, there is no need to offset it against that claim. Furthermore, since the $370,569 never was owed to Slater, it is not part of the estate available for distribution to creditors.

## B. *Recoupment*

■ Even if withholding the $370,569 is viewed as an offset against a "debt owing to" Slater, it may be recouped.

The Bankruptcy Court reasoned that, since recoupment is an equitable doctrine, "the relative harm to both parties should be carefully weighed." *Slater*, 294 B.R. at 431. It drew a distinction between this case in which it viewed Medicare as not having suffered any "pecuniary loss" and cases "where Medicare seeks to recoup funds on account of a true overpayment, i.e., where Medicare has paid more than the value of the services provided." *Id.* at 432. The Bankruptcy Court concluded that allowing Medicare to retain the $370,569 would result in a "windfall to Medicare" and would prejudice the third-party providers. *Id.* at 431–32. Accordingly, the Bankruptcy Court ordered Medicare to remit the overpayments to the debtor and directed that they be held in escrow for distribution to the third-party providers.

While the Bankruptcy Court's concern for the third-party providers is understandable, it should not have denied recoupment.

■ A bankruptcy court's authority to apply equitable principles is limited and does not confer " 'a roving commission to do equity.' " *In re Ludlow Hosp. Soc'y, Inc.*, 124 F.3d 22, 27 (1st Cir.1997) (quoting *In the Matter of Oxford Management, Inc.*, 4 F.3d 1329, 1334 (5th Cir.1993)). Thus, that authority may not be invoked to alter substantive rights that exist under bankruptcy or non-bankruptcy law. *Id.* (stating that bankruptcy court's equitable discretion in non-bankruptcy context "is limited and cannot be used in a manner inconsistent with the commands of the Bankruptcy Code") (quoting *In re Plaza de Diego Shopping Ctr., Inc.*, 911 F.2d 820, 824 (1st Cir.1990)). Here, the exercise of that authority to deny recoupment and order Medicare to pay the $370,569 to the estate was flawed in two respects.

First, in "balancing the equities," the Bankruptcy Court compared the relative harm to Medicare with the relative harm to the third-party providers. However, the issue is not whether the $370,569 should be paid to the third-party providers because they may be viewed as more deserving of the money than Medicare. Rather, the issue is whether the money should be paid to the debtor's estate for distribution in accordance with the priorities established by bankruptcy law. Setting the money aside to pay a select group of creditors would create the type of preference that the Bankruptcy Code forbids. Indeed, as the Bankruptcy Court, itself, later recognized when it entered its September 23, 2003 order, the $370,569 cannot be earmarked for the third-party providers and, if it is paid, it should be distributed in the same manner as any other assets of the debtor. Therefore, if the equities are

to be balanced, the proper comparison is between Medicare and Slater, not between Medicare and the third-party providers.

In this connection, it is crystal clear that Slater has no equitable claim to the $370,569 because it was never entitled to that money. The $370,569 was advanced to Slater subject to adjustment when the actual amounts due Slater could be determined from audits of Slater's cost reports. On the other hand, under the Medicare statute, Medicare was entitled to the return of that money and to withhold it from future payments to Slater. Thus, as between Medicare and Slater, the equities weigh heavily in favor of Medicare.

Moreover, to the extent that the desire to see that the third-party providers were paid might have established some equitable reason for denying recoupment, that reason has greatly eroded. As previously stated, the Bankruptcy Court later decided that the $370,569 should not be earmarked for the third-party providers; but, rather, should be distributed among *all* creditors. In addition, it appears that not all of the third-party providers have even filed claims and that the third-party providers are unlikely to receive much of the $370,569 because it would be applied toward administrative expenses and other claims. *See* Plan, art. V.

Nor can it be said that Medicare has not suffered a "pecuniary loss" and would realize a "windfall" by retaining the $370,569. Even assuming arguendo that only "pecuniary" losses may be recouped, Medicare did sustain a pecuniary loss by paying Slater $370,569 more than it owed Slater. Medicare's obligation to Slater was limited to reimbursing Slater for the amounts actually paid by Slater to the third-party providers. Since Slater did not pay the third-party providers, the $370,569 was not part of the "final amount" due Slater and requiring Medicare to pay that amount to

the estate would deprive Medicare of money that rightfully belongs to it.

The fact that Medicare patients received services that may have qualified for reimbursement if Slater had paid for those services, does not create a "windfall" for Medicare. There is no indication that Medicare contracted to pay for any particular services or for services furnished specifically by these third-party providers. Rather, Medicare agreed, in general, to reimburse Slater for amounts that Slater actually paid to third-party providers for services qualifying for Medicare reimbursement. Thus, if anything, allowing Slater to retain funds advanced to it as reimbursement for sums that it never paid would constitute a windfall to Slater.

Slater's failure to pay the third-party providers does not distinguish this case from any other bankruptcy in which there are unpaid creditors. If the third-party providers have some claim to the $370,569, that is separate and distinct from their claims as creditors of Slater, they are free to assert that claim in an action against Medicare. The mere fact that the third-party providers are creditors of Slater whose chances of being paid would be somewhat improved if the $370,569 is paid to the estate does not justify requiring Medicare to pay money to the estate that it does not owe to Slater.

### *Conclusion*

For reasons previously stated, that portion of the June 20, 2003, order directing the defendants to pay $370,569 to the debtor is hereby vacated. In addition, since the appeal from that portion of the June 20, 2003, order allowing the debtor to assume the Medicare Provider Agreement and all of the remaining appeals (i.e., Appeals 2–4) relate to rulings regarding the disposition of the $370,569 once it is paid

to the debtor, those appeals are dismissed as moot.

IT IS SO ORDERED.