# United States Court of Appeals

## For the First Circuit

No. 04-1349

IN RE: SLATER HEALTH CENTER, INC.,

Debtor.

SLATER HEALTH CENTER, INC.,

Plaintiff, Appellant,

v.

UNITED STATES; BLUE CROSS & BLUE SHIELD OF RHODE ISLAND,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]

Before

Torruella, Circuit Judge,
Campbell, Senior Circuit Judge,
and Lynch, Circuit Judge.

Matthew J. McGowan, with whom Salter McGowan Sylvia & Leonard, Inc. was on brief, for appellant.
Joseph M. DiOrio, with whom R. Daniel Prentiss, Robert J. Crohan, Jr., and Holland & Knight, LLP were on brief, for appellee Blue Cross & Blue Shield of Rhode Island.
Michael P. Iannotti, Assistant U.S. Attorney, with whom Robert Clark Corrente, U.S. Attorney, was on brief, for appellee United States.

February 16, 2005

**LYNCH, Circuit Judge**. Slater Health Center ("Slater"), a nursing home which is currently in Chapter 11 bankruptcy, was overpaid by Medicare because it took Medicare money for the expenses of third party-provided services but then did not pay those third parties as required. 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.100(c). The government sought to recover these overpayments by reducing Medicare reimbursements due to the bankrupt but still operational Slater. Slater responded by instituting an adversary proceeding in the bankruptcy court, alleging that this was an improper setoff within the context of bankruptcy. At issue, effectively, is whether the government may recover the overpayments to Slater to put them back into Medicare or whether Slater's estate gets the funds to be distributed to its many creditors.

This court recently held in In re Holyoke Nursing Home, Inc., 372 F.3d 1, 4 (1st Cir. 2004), that a government adjustment for a Medicare overpayment constitutes a recoupment, and not a setoff, and therefore that such an adjustment is permissible and unaffected by the bankruptcy context. The reasoning of that case controls here, where the overpayment was due to Slater's taking money from Medicare and contracting with third parties for services that were provided but for which Slater did not pay the third-party providers in a timely manner. 42 C.F.R. § 413.100(c). We affirm the district court's decision, which allowed Medicare to recoup the funds at issue.

Under the federal Medicare program, the federal government makes estimated payments at least once a month to participating health centers for reasonable costs incurred in treating Medicare patients, subject to subsequent audits and "necessary adjustments on account of previously made overpayments or underpayments." 42 U.S.C. § 1395g(a); see 42 U.S.C. § 1395x(v)(1)(A); Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 406-07 (1993). The purpose for making estimated payments, often before a provider has actually rendered a service, is to protect the liquidity of providers. See Fischer v. United States, 529 U.S. 667, 674 (2000). By statute, the Secretary of Health and Human Services is empowered to administer this cost reimbursement scheme and make regulations in this area. See 42 U.S.C. § 1395x(v)(1)(A); Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 506-07 (1994) ("Subject to a few exceptions, Congress authorized the [Secretary] to issue regulations defining reimbursable costs and otherwise giving content to the broad outlines of the Medicare statute.").

Using his power to promulgate regulations, the Secretary has defined the statutory term "overpayment." By regulation, an overpayment includes the situation where a provider is given money by Medicare to pay for certain health care services, and the provider contracts with a third party who, in turn, provides those services, but the provider fails to liquidate the liability by

paying the third party within a designated period of time. 42 C.F.R. § 413.100(c). The regulation reads, in part, as follows:

> Although Medicare recognizes, in the year of accrual, the accrual of costs for which a provider has not actually expended funds during the current cost reporting period, for purposes of payment Medicare does not recognize the accrual of costs unless the related liabilities are liquidated timely.

42 C.F.R. § 413.100(c)(1). Specifically, short-term liabilities like those at issue in this case must be paid off within one year after the end of the cost reporting period in which the liability is incurred, although extensions of up to three years after the end of the cost reporting year in which the liability is incurred may be granted. 42 C.F.R. § 413.100(c)(2)(i).

Slater, a 150-bed nursing home located in Pawtucket, Rhode Island, filed a Chapter 11 bankruptcy petition on January 26, 2001, and thereafter continued to operate as a debtor in possession. Slater is a participant in the Medicare program. Blue Cross & Blue Shield of Rhode Island ("Blue Cross"), a fiscal intermediary for Medicare,[1] notified Slater in December 2001 that it had reopened Slater's 1997 cost report for analysis and that it had found Medicare overpayments to Slater. In February 2002, Blue

---

[1]Providers may choose to receive payment from such a fiscal intermediary rather than directly from the Secretary. The intermediary then makes an agreement with the Secretary to perform various administrative responsibilities, such as performing audits and calculating overpayments. See 42 U.S.C. § 1395h; Heckler v. Cmty. Health Servs., 467 U.S. 51, 54 (1984).

Cross notified Slater that it also had found Medicare overpayments to Slater based on its 1998 cost report, which had likewise been reopened. The total amount of these overpayments, plus interest, was approximately $407,600. These sums were subject to recoupment.

All but one of the overpayments for these two years -- for $37,031 -- were overpayments under 42 C.F.R. § 413.100(c); that is, $370,569 in overpayments arose because Slater contracted with certain third-party providers for health care services to Medicare patients and the services were provided by these third parties but the third parties themselves were never paid by Slater. By the time Blue Cross notified Slater of the Medicare overpayments, Slater could not pay the third-party providers, because it was in bankruptcy.

In response to Blue Cross's notice of overpayment, Slater, beginning in January 2002, stopped billing Medicare for its receivables for a period of time. Evidently, Slater's theory was that Medicare could not recoup overpayments if Slater filed no further requests for payment. Eventually, though, this strategy became too costly for Slater; Slater filed an adversary proceeding against Blue Cross and the federal government with a federal bankruptcy court in Rhode Island on June 19, 2002, seeking injunctive and declaratory relief preventing any recoupment due to section 413.100(c) overpayments. In re Slater Health Ctr., Inc., 294 B.R. 423, 426 (Bankr. D.R.I. 2003).

The bankruptcy court denied Slater's request for a temporary restraining order on August 9, 2002, after an expedited hearing.  Id.  Slater then filed claims for all of its backed-up receivables, which were paid minus the total amount of the overpayments, $407,600.  Id. at 426-27.  Slater next moved the bankruptcy court for reconsideration of the denial of its motion for a temporary restraining order; the court granted the motion on June 20, 2003, and the bankruptcy court issued an order requiring Medicare to return $370,569 to the bankruptcy estate (the $407,600 less the $37,031 of admitted overpayment due to an accounting error).[2]  Id. at 432.

The bankruptcy court held that the automatic stay provision in the bankruptcy code, 11 U.S.C. § 362(a)(7), had not been violated because Medicare's attempt to recover all of the overpayments constituted a recoupment, rather than a setoff.  The payments and subsequent adjustments for overpayments constituted a single, integrated transaction.  In re Slater Health Ctr., Inc., 294 B.R. at 431.

However, the bankruptcy court then invoked equitable principles against the Secretary's right of recoupment and refused

---

[2]The bankruptcy court initially ordered the returned funds to be held in a separate account pending further hearings involving interested parties.  In a later, September 23, 2003 order, the bankruptcy court ruled that the funds would be held by Slater for distribution with the general funds of the estate, rather than being specifically set aside for the third-party providers that Slater did not pay.

to allow Medicare to recoup the $370,569 that was due to section 413.100(c) overpayments. Over objections that equitable principles could not overcome the Secretary's right of recoupment, the bankruptcy court held that it was entitled to perform a "careful[] weigh[ing]" of "the relative harm to both parties." Id. The court stressed that the overpayment in this case was generated by Slater's failure to pay certain third-party providers who provided Medicare services to patients; since these third-party providers were now creditors of the estate, any recoupment by Medicare would hurt the third-party providers and other creditors by giving them a reduced payout. Id. On the other hand, the court stated that Medicare would merely be gaining a windfall if it were to recoup these funds because all of the Medicare services had been provided, and thus the money was actually earned by the third-party providers and would not make up for any loss by Medicare. Id.

The bankruptcy court also determined several other, related points of contention. The bankruptcy court allowed Slater to assume the Medicare agreement and eventually confirmed Slater's Chapter 11 plan, which contained a subordination of Medicare's $370,569 overpayment claim. Id. at 432-35. The result was that Medicare would receive none of this claim.

After the plan was confirmed, the Secretary appealed the bankruptcy court's holding that it could not recoup the $370,569 overpayment (along with the subsidiary orders on the same topic) to

the federal district court, which reversed the bankruptcy court. In re Slater Health Ctr., Inc., 306 B.R. 20 (D.R.I. 2004). The district court agreed with the bankruptcy court that the automatic stay provision of 11 U.S.C. § 362(a)(7) did not apply to Medicare's $370,569 claim because it was a recoupment, rather than a setoff.[3] Id. at 25.

However, the district court held that the bankruptcy court had erred in ranging so broadly to balance the equities in order to nonetheless deny Medicare its right of recoupment and, at any rate, the equities cut in Medicare's favor. Id. at 26-27. The proper balancing was not between Medicare and the third-party providers, but between Slater and Medicare, because the money could not be set aside merely for the use of the unpaid creditors and its return to the estate would only "somewhat improve[]" those unpaid creditors' chances of being paid. Id. And this was money that Slater was never entitled to, because Medicare agreed to reimburse only reasonable expenses that were actually paid. This money

---

[3]The district court also offered an alternative argument: it did not even need to reach the recoupment versus setoff analysis because Slater had no claim to the $370,569 at all. There was merely a debt to Slater, in which Slater's entitlement was defined as its reasonable costs less any prior overpayments. See In re Slater Health Ctr., Inc., 306 B.R. at 25. We faced a similar argument in In re Holyoke Nursing Home, Inc., 372 F.3d 1, 4 n.1 (1st Cir. 2004), where we did not address it because we resolved the case using recoupment analysis. We likewise resolve this case using recoupment analysis, and do not address this alternative argument, which is not advanced by the Secretary on appeal.

-8-

rightly belonged to Medicare, and, "if anything, allowing Slater to retain funds advanced to it as reimbursement for sums that it never paid would constitute a windfall to Slater."  Id. at 27.  This resolution of the recoupment issue mooted the related issues in the case, so the appeals of the related bankruptcy court orders were dismissed.  Id. at 27-28.

Neither the bankruptcy court nor the district court had the benefit of our decision in In re Holyoke Nursing Home, Inc., 372 F.3d 1 (1st Cir. 2004), which was issued later.

Slater appeals from the district court's allowance of Medicare's $370,569 recoupment.  It also argues that if the recoupment is disallowed and the $370,569 is returned to the bankruptcy estate, then it should still be allowed to assume the Medicare agreement and its Chapter 11 plan should be confirmed despite the subordination of Medicare's claims.

## II.

The dispositive issue in this case is simply whether Medicare's adjustment to Slater's reimbursement claims for prior overpayments constituted an invalid setoff that contravened the bankruptcy code's automatic stay provision, 11 U.S.C. § 362(a)(7), or instead a valid recoupment, which would not be affected by bankruptcy but could simply be deducted from debts owed to Slater as a matter of course.  See Holyoke, 372 F.3d at 3.  A setoff is C's deduction from C's debt to B of an amount based on B's

unrelated debt to C; a recoupment is C's deduction from C's debt to B based on B's debt to C arising out of the same transaction. See, e.g., id. at 3-4; United Structures of Am., Inc., v. G.R.G. Eng'g, S.E., 9 F.3d 996, 998 (1st Cir. 1993); see also Collier on Bankruptcy ¶ 553.10 (15th ed. rev. 2004).

The answer to this question is controlled by our recent decision in In re Holyoke Nursing Home, Inc. In that case we held, in conformity with the majority of other circuits to consider the question, that Medicare's adjustment for an overpayment constitutes a recoupment, not a setoff: "Both the Medicare statute and the provider agreement -- by contemplating [Medicare's] payment of estimated costs, corrective audits, and retroactive adjustments or partial adjustments for overpayments and underpayments in determining [Medicare's] net liability for current cost-year services -- strongly indicate that the contractual relationship between [Medicare] and Holyoke constitutes one, ongoing, integrated transaction." Id. at 4. We further held that once adjustments for Medicare overpayments had been determined to be recoupments, further "equitable balancing" was improper. Id. at 5.

Slater attempts to distinguish Holyoke by arguing that Holyoke did not deal with this particular kind of overpayment: an overpayment due not to, for example, Slater's billing of services that it did not provide, but instead to Slater's failure to pay third-party providers for services that have already been provided.

-10-

42 C.F.R. § 413.100(c). The Secretary is statutorily given power to make regulations administering the reimbursement system, including adjustments for under- and overpayments. Slater has lodged no challenge to the Secretary's regulation, 42 C.F.R. § 413.100(c), which defines this sort of conduct as an overpayment.

Slater argues, however, that the "same transaction" test for recoupment is not met here because the unpaid sums owed the third-party therapy providers are wholly extrinsic to the relationship between Slater and Medicare. This is incorrect. The Medicare regulations define "overpayment" as including a provider's failure to liquidate costs in a timely manner. 42 C.F.R. § 413.100(c).

The regulation's inclusion of this situation as an overpayment is perfectly logical: Medicare's interest is not simply in ensuring that patients are treated, but is also, under a cost reimbursement system, in making sure that its money only reimburses providers for reasonable Medicare-related expenses that providers actually pay out as required. See, e.g., Good Samaritan Hosp., 508 U.S. at 405-06. Providers are advanced money based on costs with the understanding that they will actually have to pay those costs; if they do not, then adjustments for overpayments must be made because providers have no entitlement to the extra money. See id. at 406-07. If costs are not liquidated within a certain period of time, then Medicare justifiably assumes that they will not be paid

-11-

at all and therefore that providers are sitting on a windfall profit. A different rule, as desired by Slater, would create incentives for health care providers not to pay third-party providers on a timely basis.

Slater did not use its Medicare money to pay its third-party provider Medicare-related expenses in the past. In the context of bankruptcy, where the funds in the estate will be used to pay off a wide variety of creditors and other expenses, there is no guarantee that all or most of the funds will be used to pay third-party providers if the overpayment were returned to the bankruptcy estate. See Holyoke, 372 F.3d at 5. The overpayment claim under § 413.100(c), far from being wholly extrinsic to the relationship between Medicare and Slater, is in fact integral to it.[4] The recoupment analysis in Holyoke, which treats Medicare adjustments for over- and underpayments as part of an ongoing stream to ensure that providers get only the money that they are actually entitled to, is thus fully applicable here.

Under Holyoke, the bankruptcy court erred in performing further equitable balancing once the recoupment versus setoff analysis had been completed. Holyoke, 372 F.3d at 5. Both

---

[4]We therefore do not accept Slater's argument that § 413.100(c) is merely a penalty that gives providers an incentive to liquidate Medicare expenses in a timely manner, rather than a true type of overpayment. Section 413.100(c) has an incentive effect, but it is also an additional way to ensure that Medicare payments are reimbursements for actual expenses paid out, and not windfall profits for phantom provider costs.

rationales present in Holyoke are applicable here.  First, the "same transaction" analysis itself inherently embodies competing issues of equity, for the simple reason that "it would be inequitable for [a debtor] to enjoy the benefits of the same transaction without also meeting its obligations." Id. (quoting In re Univ. Med. Ctr., 973 F.2d 1065, 1081 (3d Cir. 1992) (internal quotation marks omitted)) (emphasis and alteration in Holyoke).  In at least most cases, analysis of the recoupment issue should both begin and end with the same transaction question without discussing other equitable issues.  See, e.g., United Structures of Am., 9 F.3d at 999 ("[W]hen a debtor in bankruptcy seeks to recover from a creditor whose claim against the debtor arises out of the same transaction, allowing the creditor to recoup damages simply allows the debtor precisely what it is due when viewing the transaction 'as a whole.' . . .  [A] debtor has, in a sense, no right to funds subject to recoupment."); Collier on Bankruptcy ¶ 553.10 (15th ed. rev. 2004) ("[T]he key question in most recoupment cases is whether the relevant obligations constitute part of the 'same transaction.'").  Since we have already determined that the same transaction test is met in this case, we need not go further.

As well, the Holyoke court noted that a bankruptcy court's inherent equitable powers cannot be used in a way that alters substantive rights defined under applicable nonbankruptcy law.  See Holyoke, 372 F.3d at 5; see also In re Ludlow Hosp.

-13-

Soc'y, 124 F.3d 22, 27 (1st Cir. 1997).  Here, Congress intended, in the Medicare statutes, for the Medicare payment adjustment system to operate as one continuous stream, including adjustments for "overpayments" (a term that the Secretary has power to define). 42 U.S.C. § 1395g(a); 42 U.S.C. § 1395x(v)(1)(A); Holyoke, 372 F.3d at 5; United States v. Consumer Health Servs. of Am., Inc., 108 F.3d 390, 394 (D.C. Cir. 1997).  Equitable powers should not be used to interfere with this Congressional policy choice.[5]  Holyoke, 372 F.3d at 5.

We therefore hold that the $370,569 can be recouped by Medicare as an overpayment adjustment, and need not be returned to Slater's bankruptcy estate.  We need go no further.  Since the $370,569 overpayment to Slater will be recouped, Slater is unquestionably permitted to assume the Medicare agreement under 11 U.S.C. § 365.  The question of whether Slater must cure by paying $370,569 to Medicare as a condition of assuming the contract under 11 U.S.C. § 365(b) never arises, and we need not discuss the issue of whether such assumption of an executory contract would have been permitted even if the $370,569 had instead been returned to

---

[5]At any rate, as the district court noted, the equities do not favor Slater.  Slater never used the Medicare money for reasonable Medicare costs, but now wants to make it available for distribution to all of its creditors.  Medicare ought to be able to reasonably expect that its money, which is part of the public fisc, will go only to reimbursements for actual Medicare costs and will not be used for other purposes.  See In re Slater Health Ctr., Inc., 306 B.R. at 27.

-14-

Slater's estate.  The Secretary's objections to the confirmation of Slater's plan are now likewise moot, because the Medicare overpayments, having been recouped by Medicare, are no longer part of the plan.

## III.

The decision of the district court allowing Medicare's recoupment of the $370,569 is **affirmed**, and the case is remanded to the bankruptcy court for proceedings consistent with this opinion.