# United States Court of Appeals
## For the First Circuit

No. 16-1731

PARKVIEW ADVENTIST MEDICAL CENTER,

Appellant,

v.

UNITED STATES OF AMERICA, on behalf of the Department of Health
and Human Services, Centers for Medicare & Medicaid Services,

Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Lynch, Stahl, and Barron,
Circuit Judges.

George J. Marcus, with whom Jennie L. Clegg, David C. Johnson,
Andrew C. Helman, and Marcus Clegg were on brief, for appellant.
Jeffrey Clair, with whom Benjamin C. Mizer, Principal Deputy
Assistant Attorney General, Thomas E. Delahanty II, United States
Attorney, and Michael S. Raab were on brief, for appellee.
John A.E. Pottow and Asher Steinberg on brief as amicus
curiae.

November 29, 2016

**LYNCH**, **Circuit Judge**.  This is an important case resting at the intersection of the Bankruptcy Code and Medicare law.  It concerns the efforts of the Parkview Adventist Medical Center ("Parkview") in Brunswick, Maine, which filed for bankruptcy on June 16, 2015, to use the Bankruptcy Code to challenge the actions of appellee United States, through the Centers for Medicare & Medicaid Services ("CMS"), in terminating its "Provider Agreement" with Parkview and declining to reimburse Parkview for certain services provided after the effective date of that termination.

After receiving a letter from Parkview, CMS concluded that Parkview's Provider Agreement was to be terminated, because CMS found that Parkview was no longer a "hospital" under the Medicare statute.  See 42 U.S.C. § 1395x(e)(1).  An administrative law judge ("ALJ") has issued a determination upholding the termination but adjusting the effective date.

Both the bankruptcy court and the reviewing U.S. district court, see Parkview Adventist Med. Ctr. v. United States, No. 2:15-cv-00320-JDL, 2016 WL 3029947 (D. Me. May 25, 2016), denied Parkview's "Motion to Compel Post Petition Performance of Executory Contracts," which sought, inter alia, a "[d]etermin[ation] that the Termination Notice [from CMS] is null and void and that the Provider Agreement [governing Parkview's eligibility for Medicare reimbursement] remains in full force and effect."  It also sought relief "requiring CMS to honor the terms

- 2 -

of the Provider Agreement and [to] reimburse [Parkview] for Part B Services provided by [Parkview] from and after June 18, 2015, in accordance with the terms of the Provider Agreement," as well as "such other and further relief as is just and equitable."[1]

In this motion, Parkview argued that the Provider Agreement was an "executory contract" under 11 U.S.C. § 365, and accordingly within the bankruptcy court's jurisdiction. As such, Parkview contended, CMS's termination of the Provider Agreement was "a post-petition termination . . . without court authority, and prior to the Debtor having exercised its right to assume or reject the Provider Agreement," in violation of "[11 U.S.C.] §§ 365, 362 and 525 of the Code." Parkview further argued that CMS's termination of the Provider Agreement violated (1) the "automatic stay" in 11 U.S.C. § 362(a)(3), which stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate," and (2) the non-discrimination provision in 11 U.S.C. § 525(a),

---

[1]     At oral argument for this appeal, Parkview attempted to reframe the relief it sought. It claimed it was not seeking the continuation of any immediate payment, but rather the effective reinstatement of the Provider Agreement for the period from July 5, 2015 to August 20, 2015. Parkview conceded at oral argument that, despite its claim that it was not seeking immediate payment, the reinstatement of the Provider Agreement for the stated period would lead to reimbursement payments totaling several million dollars. Later at oral argument, Parkview characterized the relief it seeks somewhat differently -- namely, as an annulment of CMS's termination letter.

which provides that governmental agencies may not revoke a license or a similar grant solely on account of a party's insolvency or the fact that a party has filed a bankruptcy petition.

The bankruptcy court concluded that it lacked jurisdiction over the motion until Parkview's claims were administratively exhausted and that CMS had not violated either the automatic stay or the non-discrimination provision. The district court affirmed, reasoning that 42 U.S.C. §§ 405(g) and 405(h) "[t]ogether . . . require the exhaustion of administrative remedies through the agency review process before judicial review takes place." Parkview, 2016 WL 3029947, at *5. Section 405(g)[2] provides in part that:

> Any individual, after any final decision of the [Secretary] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the [Secretary] may allow.

42 U.S.C. § 405(g). Section 405(h)[3] further provides that:

> The findings and decision of the [Secretary] after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the [Secretary] shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the [Secretary], or any officer or employee thereof

---

[2]    Section 405(g) is made applicable to the Medicare statute via 42 U.S.C. § 1395ff(b)(1)(A).

[3]    Section 405(h) is made applicable to the Medicare statute via 42 U.S.C. § 1395ii.

shall be brought under section 1331 or 1346 of Title 28
to recover on any claim arising under this subchapter.

42 U.S.C. § 405(h).  The district court concluded that Parkview's

claims arose under the Medicare statute and that the final sentence

of § 405(h) bars bankruptcy jurisdiction over such

administratively unexhausted claims.  Parkview, 2016 WL 3029947,

at *6-8.  The district court also affirmed the bankruptcy court's

holding that CMS had not violated the automatic stay, see 11 U.S.C.

§ 362(a)(3), nor the non-discrimination provision, see 11 U.S.C.

§ 525(a).  Parkview, 2016 WL 3029947, at *8.

We acknowledge that there is a circuit split on the lack-

of-jurisdiction holding pertaining to § 405(h), as described by

the district court.[4]  As the district court correctly observed,

the majority of circuits have adopted the view -- based on previous

versions of the statute and its legislative history -- that even

though § 405(h) specifically mentions a bar to jurisdiction under

only 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1346

(jurisdiction when the United States is a defendant), its

jurisdictional bar "applies to other grants of jurisdiction under

Title 28, including bankruptcy jurisdiction under § 1334."[5]

---

[4] We also acknowledge the amicus brief of Professor John Pottow.  As Professor Pottow himself recognizes, his brief presents arguments on the jurisdictional question not advanced by the parties, and generally "an amicus cannot introduce a new argument into a case."  United States v. Sturm, Ruger & Co., Inc., 84 F.3d 1, 6 (1st Cir. 1996).

[5] See In re Bayou Shores SNF, LLC, 828 F.3d 1297, 1314

- 5 -

Parkview, 2016 WL 3029947, at *5. Only the Ninth Circuit has clearly adopted a contrary position. See Do Sung Uhm v. Humana, Inc., 620 F.3d 1134, 1141 n.11 (9th Cir. 2010) (citing In re Town & Country Home Nursing Servs., Inc., 963 F.2d 1146, 1155 (9th Cir. 1991)); cf. In re Univ. Med. Ctr., 973 F.2d 1065, 1073 (3d Cir. 1992) (holding that § 405(h) did not preclude bankruptcy jurisdiction over an action to bar the offset of reimbursement of post-petition services against pre-petition overpayments because the claim did not "arise under" the Medicare statute). Rather than add our voice to the circuit split on this difficult issue, we choose to resolve this case on narrower grounds evident from the record.[6] We affirm.

---

(11th Cir. 2016) (concluding that § 405(h)'s jurisdictional bar applies to 28 U.S.C. § 1344); Nichole Med. Equip. & Supply, Inc. v. TriCenturion, Inc., 694 F.3d 340, 346–47 (3d Cir. 2012) (concluding that § 405(h) "continues to bar virtually all grants of jurisdiction under Title 28," and holding specifically that it bars diversity jurisdiction under 28 U.S.C. § 1332); Midland Psychiatric Assocs., Inc. v. United States, 145 F.3d 1000, 1004 (8th Cir. 1998) (holding that § 405(h)'s jurisdictional bar applies to 28 U.S.C. § 1332); Bodimetric Health Servs., Inc. v. Aetna Life & Cas., 903 F.2d 480, 488–90 (7th Cir. 1990) (same).

[6]     Parkview argues that we already decided in In re Slater Health Center, Inc., 398 F.3d 98 (1st Cir. 2005), that § 405 does not bar bankruptcy jurisdiction. But Slater said nothing about this jurisdictional issue, and "[w]hen a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed." Ariz. Christian Sch. Tuition Org. v. Winn, 131 S. Ct. 1436, 1448 (2011). Slater does not settle the question.

Since only statutory jurisdiction is at stake in the § 405(h) jurisdictional question and not Article III jurisdiction, we assume hypothetical jurisdiction. We have done so before when confronted with the same § 405(h) question, and we do so again here, because of the difficulty of the jurisdictional issue and because Parkview's merits claims under the Bankruptcy Code obviously fail. See In re Ludlow Hosp. Soc., Inc., 124 F.3d 22, 25 n.7 (1st Cir. 1997) ("As the [§ 405(h)] jurisdictional question is problematic, and the merits of the Trustee's appeal are not, we elect to bypass the jurisdictional issue at this time." (citations omitted)).[7]

Assuming arguendo that this case arises under the Bankruptcy Code, we affirm the denial of relief to Parkview. We do so because the record is clear that CMS did not violate the automatic stay provision. The statutory "police and regulatory power" exception to the automatic stay under 11 U.S.C. § 362(b)(4) plainly applies. It follows, then, for this and other reasons, that the non-discrimination provision of the Code is not offended.

---

[7] See also, e.g., Telles v. Lynch, 639 F. App'x 658, 659 (1st Cir. 2016) (unpublished opinion) ("Because the petitioner's claims easily fail on the merits, we assume hypothetical jurisdiction."); Alvarado v. Holder, 743 F.3d 271, 276 (1st Cir. 2014) ("[U]nlike Article III jurisdiction, which we may never dodge, we may occasionally bypass statutory jurisdiction."); McBee v. Delica Co., Ltd., 417 F.3d 107, 127 (1st Cir. 2005) (discussing appropriateness of bypassing jurisdictional question where Article III jurisdiction is not in doubt and merits claim clearly fails).

As to the arguments Parkview makes on appeal regarding the § 365 executory contract provision of the Code, we find that Parkview's sparse briefing amounts to waiver of the issue.[8]  See Aponte v. Holder, 683 F.3d 6, 10 n.2 (1st Cir. 2012).

                                    I.

           In the interests of brevity, we recite only the facts necessary to this opinion.  Before its petition for bankruptcy, Parkview operated as a fifty-five-bed hospital in Brunswick, Maine.  It "provided emergency services, inpatient services, and a variety of outpatient, ambulatory clinics and other medical services" to the community.  It maintained a Provider Agreement with CMS that specified the conditions to which Parkview had to agree and adhere in order to participate in Medicare and receive reimbursements for both Part A (inpatient) and Part B (outpatient) services.  See generally 42 U.S.C. §§ 1395cc(a)(1) (listing requirements of a Provider Agreement with a "provider of services"), 1395x(u) ("The term 'provider of services' means a hospital, critical access hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, hospice program, or, for purposes of section 1395f(g) and section 1395n(e) of this title, a fund."), 1395x(e) (defining

_____

           [8]    This obviates the need to discuss the date of the termination.

- 8 -

"hospital" as an institution primarily engaged in providing specified inpatient services, and listing other conditions).

Parkview sent CMS a letter dated June 15, 2015, stating that Parkview was ending its participation in Medicare. The letter stated that Parkview would be filing a voluntary chapter 11 petition on June 16, 2015 and that it would be "closing as a hospital effective upon the order of the Bankruptcy Court and will no longer participate in the Medicare Program . . . as an acute care hospital provider." It further stated that Parkview "expect[ed] the Bankruptcy Court to enter its order within sixty (60) to ninety (90) days of the date of this letter." Parkview would "begin to transition acute care services to Mid Coast Hospital beginning June 18, 2015," but would "continue to provide outpatient services." Parkview filed its voluntary chapter 11 petition on June 16, 2015.[9]

In a letter dated June 19, 2015, CMS replied that it would terminate the Provider Agreement as of June 18, 2015:

---

[9] The government argues that because "Parkview's plan of 'reorganization' was, from the outset intended to liquidate all its assets, there is a substantial question as to whether this case was properly filed under chapter 11 rather than chapter 7." The question is significant, the government suggests, because under chapter 7, an executory contract that is not assumed within sixty days of the commencement of the bankruptcy is deemed rejected, an action the government contends Parkview "never had any intention of taking and had no practical ability to complete after selling its inpatient hospital assets." See 11 U.S.C. § 365(d)(1). Because Parkview's legal arguments fail even if its chapter 11 petition was proper, we need not reach this argument.

Based upon information from your hospital's website, your statements to CMS, and your emergency motion filed in the District of Maine bankruptcy case 15-20442, CMS has determined that the date of voluntary termination of your Part A Medicare Provider Agreement is June 18, 2015. See 42 C.F.R. § 489.52(b)(1).

According to the information reviewed by CMS, the hospital has closed its inpatient care services on June 18, 2015, and discharged all inpatients on or about 4:00pm on June 18, 2015. Additionally, the hospital is not accepting new inpatients, and does not plan to accept new inpatients in the future. Therefore, the hospital no longer meets the definition of "hospital," as outlined in Section § 1861(e) of the Social Security Act. See also 42 C.F.R. § 482.1. More specifically, a Medicare-participating hospital must be an institution which is primarily engaged in providing care to inpatients. Additionally, you have also requested voluntary termination of your participation in the Medicare program.

Therefore, under the provisions of Federal regulations at 42 C.F.R. § 489.52(b)(1, 3), your Part A Medicare Provider Agreement with the Secretary of Health and Human Services is terminated, effective June 18, 2015. No payment under this agreement can be made under the Medicare program for services rendered on or after June 18, 2015.

On June 19, 2015, the Maine Department of Health and Human Services "issued a conditional license for Parkview to operate outpatient services during the pendency of the bankruptcy proceedings," but "did not authorize Parkview to admit inpatients." Parkview then "informed CMS that it was not terminating the Provider Agreement and that CMS'[s] decision to terminate the agreement would adversely affect Parkview's

bankruptcy transition plan."[10]  In response, CMS stated that it would rescind the termination if Parkview resumed admission of inpatients.  Parkview then filed its motion to compel in the bankruptcy court on July 9, 2015, and this litigation ensued.[11]

## II.

We turn to the merits of the claims Parkview has preserved for appeal.  Parkview argues that CMS's termination of the Provider Agreement violates the Code's automatic stay.  See 11 U.S.C. § 362(a)(3).  And it contends that the termination was an impermissible discrimination against a debtor in bankruptcy, within the meaning of 11 U.S.C. § 525(a).  These claims raise

---

[10]  On July 27, 2015, Parkview informed CMS that it considered CMS's termination an involuntary termination "because CMS based the effective date of termination on Parkview's failure to meet a requirement to be a hospital in the Medicare program" and sought to rescind its notice of voluntary termination.

[11]  On August 17, 2015, Parkview requested a hearing before an ALJ to dispute CMS's termination of the Provider Agreement.  As already described above, the ALJ found, after briefing, that CMS had involuntarily terminated the Provider Agreement and that it had had a legitimate basis to do so, because Parkview had permanently closed its inpatient services on June 18, 2015.  Due to the notice requirements of the relevant regulations, the ALJ adjusted the effective date of the termination to July 4, 2015. The ALJ also rejected Parkview's argument for equitable estoppel because CMS had allegedly provided -- through an employee of the Maine Department of Health and Human Services -- false information to Parkview while Parkview was preparing its transition plan for bankruptcy.

- 11 -

issues of law subject to <u>de novo</u> review. <u>Barbosa</u> v. <u>Soloman</u>, 235 F.3d 31, 35 (1st Cir. 2000). Both arguments fail on the merits.

A.      <u>Automatic Stay</u>

Parkview argues that CMS's termination of the Provider Agreement violated the automatic stay in § 362(a)(3). The statute provides that counterparties may not take "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Parkview contends that, because the Provider Agreement is an executory contract, CMS may not involuntarily terminate it. It cites a number of cases for the proposition that a counterparty may not involuntarily terminate an executory contract post-petition. <u>See</u> <u>In re Mirant Corp.</u>, 440 F.3d 238, 251–53 (5th Cir. 2006); <u>In re Comput. Commc'ns, Inc.</u>, 824 F.2d 725, 728–31 (9th Cir. 1987).

The government does not dispute that the Provider Agreement is an executory contract within the meaning of the Bankruptcy Code.[12] But it contests on a number of grounds Parkview's assertion that the termination of the Provider

---

[12]    "The Bankruptcy Code furnishes no express definition of an executory contract, <u>see</u> 11 U.S.C. § 365(a) (1982 ed.), but the legislative history of § 365(a) indicates that Congress intended the term to mean a contract 'on which performance remains due to some extent on both sides.'" <u>N.L.R.B.</u> v. <u>Bildisco & Bildisco</u>, 465 U.S. 513, 522 n.6 (1984) (quoting H.R. Rep. No. 95-595, p. 347 (1977)).

Agreement violates § 362(a)(3). It argues that the Provider Agreement is not "property of the estate" under the meaning of § 362(a)(3); that that automatic stay does not expand Parkview's contractual rights under the automatic stay, and that "Parkview . . . has never had a cognizable property or contractual interest in participating in Medicare without meeting Medicare's conditions of participation"; and that the automatic stay does not apply to the termination because it is a "nonfinal agency action[]." The government further asserts that even if Parkview had a property interest in the Provider Agreement and the stay applied on its face to the termination, the "police and regulatory power" exception to the stay in 11 U.S.C. § 362(b)(4) would apply.[13] Without reaching the other arguments, we agree that the police and regulatory power exception to the stay applies to CMS's termination of the Provider Agreement.

The exception provision in § 362(b)(4) provides that the automatic stay of actions against the debtor does not apply to "an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power." In turn,

---

[13] Parkview also disputes the bankruptcy court's suggestion that CMS's termination of the Provider Agreement is exempt under 11 U.S.C. § 362(b)(28), which allows the Secretary of Health and Human Services to exclude debtors from participating in Medicare in certain circumstances. Because the police and regulatory power exception applies and because the government does not argue for the "exclusion" exception, we do not reach this issue.

under In re McMullen, 386 F.3d 320, 325 (1st Cir. 2004), we make two inquiries. We ask whether the governmental action "is designed primarily to protect the public safety and welfare." Id. If so, the government action -- here the termination of the Provider Agreement -- is exempt. Id. But if the action is an attempt by the government to recover property from the estate, it has a pecuniary purpose and so remains subject to the stay. Id.; see also In re Nortel Networks, Inc., 669 F.3d 128, 140 (3d Cir. 2011) ("If the purpose of the law is to promote public safety and welfare or to effectuate public policy, then the exception to the automatic stay applies. If, on the other hand, the purpose of the law is to protect the government's pecuniary interest in the debtor's property or primarily to adjudicate private rights, then the exception is inapplicable.")

Parkview argues that the CMS termination was not based on findings of a threat to the health or safety of patients. The premise of this argument is true, but largely irrelevant, as it is based on too circumscribed a view of the public interest. Our precedents distinguish between "actions enforcing generally applicable regulatory laws governing the behavior of debtors," which fall within the exception, and actions by "government agencies to enforce contractual rights against debtors," which do not. In re Corporacion de Servicios Medicos Hospitalarios de Fajardo, 805 F.2d 440, 445 (1st Cir. 1986). The question is

- 14 -

whether CMS's termination enforces a generally applicable regulatory law or furthers a public policy interest beyond the contractual rights in the Provider Agreement.

CMS has a strong public policy interest in seeing that Medicare-program dollars are not spent on institutions that fail to meet qualification standards. In this instance, the standards are those for "hospitals." See 42 U.S.C. § 1395*l*(t); 42 C.F.R. § 419. Reimbursing Parkview pursuant to the Provider Agreement after it had taken actions to disqualify itself from the Medicare program, rendering it unable to provide services required by that program, would have been a waste of public monies.[14] And unlike a dispute over a contractual agreement between the government and a single private party, such as the one at issue in In re Corporacion, applying the stay against CMS here would threaten CMS's ability to enforce generally the Medicare statute's carefully articulated regulatory structure. See In re

---

[14] Parkview does not concede that it ceased to be a hospital under the Medicare statute. But the substantive correctness of CMS's determination that Parkview ceased to be a hospital under the Medicare statute does not affect the analysis of whether the police and regulatory power exception to the stay applies to the decision, nor does it affect the analysis of whether the decision was discriminatory under § 525(a). In any event, Parkview in its briefing makes a point of not contesting any substantive issue of Medicare law, including whether its actions disqualified it as a "hospital" under the relevant provisions, and so the point is waived. United States v. Richardson, 225 F.3d 46, 52 n.2 (1st Cir. 2000) (explaining that issues raised for the first time at oral argument are waived).

<u>Corporacion</u>, 805 F.2d at 445-46 & n.5 (contrasting actions to enforce contractual rights with actions "to enforce specific provisions of general regulatory schemes," and noting that the government had not tried to revoke the debtor hospital's license until after filing an action to rescind its contract with the hospital, as well as the fact that the hospital had passed a "Medicare compliance inspection"). The termination here was plainly the exercise of a regulatory power provided in the Medicare statute. <u>See</u> 14 U.S.C. § 1395cc(b)(2)(B) (explaining that the Secretary may terminate a Provider Agreement when the provider "fails substantially to meet the applicable provisions of section 1395x of this title," which includes the statutory definition of "hospital").

Further, it is clear that the termination of the Provider Agreement does not meet the pecuniary test. The government is not seeking recovery from Parkview, nor is it demanding any payment. Rather, one could reasonably view Parkview's petition as being made for the purpose of evading CMS's efforts to secure compliance with the Medicare statute -- exactly the kind of action the police and regulatory power exception is meant to prevent. <u>See</u> <u>In re</u> <u>McMullen</u>, 386 F.3d at 324-25. Because CMS's termination of the Provider Agreement enforced the generally applicable framework of the Medicare statute and advanced a significant public policy

interest, the police and regulatory power exception applies, and the automatic stay does not bar the termination.

We do not reach the other arguments raised by the government as to the stay's application.

B.      Non-Discrimination Provision

Parkview also argues that CMS's termination of the Provider Agreement violates the "non-discrimination" provision in 11 U.S.C. § 525(a), which states that:

> [A] governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, [or] discriminate with respect to such a grant against, . . . a person that is or has been a debtor under this title.

11 U.S.C. § 525(a).  Parkview argues that, because CMS's termination letter "came only two days after Parkview filed its chapter 11 petition and expressly stated that CMS's termination of the Provider Agreement followed CMS's review of court filings in this chapter 11 case," we should conclude that CMS terminated the Provider Agreement because of Parkview's insolvency.

We see nothing in the termination decision that depended upon Parkview's insolvency or bankruptcy petition.  CMS stated in its June 19 letter that it was terminating the Provider Agreement because Parkview had decided to close its inpatient facilities and thereby had ceased to qualify as a hospital under the Medicare

- 17 -

statute. That termination decision involved no forbidden discrimination based on insolvency.

Parkview's argument that CMS discriminated against it, because CMS took notice of the filing of the bankruptcy petition in its termination decision, fails on its face. That CMS used information from that filing in considering the termination question is admirable and not discrimination.[15]

CMS's termination of the Provider Agreement is distinguishable from the cases Parkview cites in its favor. In In re Psychotherapy & Counseling Center, Inc., the Department of Health and Human Services ("HHS") attempted to exclude a mental health hospital from participation in Medicare and state health care programs after the hospital defaulted under a settlement plan with HHS and filed for chapter 11 bankruptcy. 195 B.R. 522, 524–27 (Bankr. D.D.C. 1996). The bankruptcy court rejected HHS's argument that the police and regulatory power exception applied

_____

[15] Parkview claims that "CMS did not base its termination decision on any order of the Bankruptcy Court, any deficiency in the provision of services by Parkview, or any claimed breach of the provisions of the Provider Agreement itself." This assertion seems intended to suggest that CMS had no basis for its decision other than the fact of Parkview's filing for bankruptcy. CMS may not have based its decision on an order by the bankruptcy court, but it did consult Parkview's papers in the bankruptcy court to determine the termination date for the Provider Agreement. And CMS did base its termination decision on Parkview's decision to cease inpatient services, which is clearly a "deficiency in the provision of services" with respect to the Medicare statute, as well as a clear breach of the Provider Agreement.

and concluded that HHS's action violated § 525(a) because the record suggested that "HHS [was] seeking to exclude the debtor from a government program for non-payment of a dischargeable prepetition debt." Id. at 533. There is no basis for such an inference here. Quite the opposite -- CMS has maintained throughout this litigation that its reason for terminating the Provider Agreement was Parkview's decision, announced in its June 15 letter, to disqualify itself as a hospital under the Medicare statute, and there is no evidence to the contrary.

Similarly, in In re Sun Healthcare Group, Inc., the Health Care Financing Administration ("HCFA"), a division of HHS, refused to reinstate the subsidiary of a debtor corporation as a Medicare and Medicaid participant, even after the subsidiary had "met all compliance conditions and applied for reinstatement," because the subsidiary owed pre-petition debts to HCFA. No. 00-986-GMS, 2002 WL 2018868, at *1 (D. Del. Sept. 4, 2002). The district court affirmed the bankruptcy court's finding that HCFA's action had violated § 525(a) because, although the subsidiary had "provided reasonable assurance that its health services w[ould] meet HCFA regulations," it had discriminated against the debtor on account of its pre-petition debts. Id. at *7-8. Here, the termination had nothing to do with Parkview's pre-petition debts, and Parkview cannot assure CMS that Parkview will bring itself

back into compliance with the Medicare statute.  CMS's termination of the Provider Agreement was not impermissible discrimination.[16]

III.

The district court's denial of relief is <u>affirmed</u>.[17]  Costs are awarded against Parkview.

---

[16]  As part of its discrimination argument, Parkview notes that CMS's termination decision led to the State of Maine's termination of Parkview's MaineCare Provider Agreement and that CMS's termination of the Medicare Provider Agreement will also terminate Parkview's Medicare Advantage Agreement and TriCare Agreement.  These consequences of CMS's termination decision say nothing about the legal question of whether the decision was discriminatory under § 525(a).

[17]  To be clear, the government has represented that physicians at Parkview's remaining facilities may seek Medicare Part B reimbursement for non-hospital outpatient services.